UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TW SNOWBOARD SETTLEMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>U.S. BANK, a national banking association, and DON THACKER, U.S. Bankruptcy Trustee,<br><br>Defendants. | CASE NO. C04-1912RSM<br><br>MEMORANDUM ORDER GRANTING PLAINTIFF'S MOTION TO WITHDRAW ADMISSION AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on defendant U.S. Bank's Motion for Summary Judgment and plaintiff's Motion to Withdraw Document (Admission). (Dkts. #15 and #20). In its motion for summary judgment, U.S. Bank has moved this Court to dismiss plaintiff's tortious interference and conversion claims. Defendant argues that, although it did refuse to release the molds in question in this case, there was no tortious interference because no contract existed with which to interfere, and, even if a contract did exist, defendant's actions were justified by its security interest in the molds. Plaintiff responds that it has provided sufficient evidence to create a material issue of fact as to the existence of a contract, and that U.S. Bank's actions were not

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 1

justified since plaintiff had already put U.S. Bank on notice that the bank held a junior security interest in the molds.  For the reasons set forth below, the Court disagrees with plaintiff, and GRANTS defendant's motion for summary judgment.

## II.  DISCUSSION.

### A.  Background

This case arises out of a dispute over molds used to make snowboard bindings, and who has a priority interest in those molds.  The history of this action is made somewhat more complicated by the fact that it involves the bankruptcy of plaintiff.  The relevant facts are set forth below.

Sims Sports, Inc. ("Sims") contracted with C-Tech Plastics, Inc. ("C-Tech") to produce snowboard bindings. Although the initial date of the contract is unclear, both parties agree that this relationship existed as far back as April of 1999.  As a part of the contract, Sims sent C-Tech industrial molds to use in the plastic snowboard binding fabrication process.

Plaintiff, TW Snowboard Settlement, LLC ("TW"), claims a secured interest in Sims' molds arising initially from a series of secured loans between Sims and two other companies, which were subsequently assigned to TW.  On April 29, 1999, Wyndcrest Sims Holdings, III, Ltd. ("Wyndcrest") gave Sims a $2,850,000 loan secured by a blanket security interest.  The blanket security interest included all of Sims collateral and assets. On April 7, 2000, Textor Second Tier Limited Partnership ("T2T") gave Sims a $2,000,000 loan which was also secured by a blanket security interest in Sims. T2T filed a UCC-1 financing statement on March 8, 2001, to provide notice that Sims had granted a blanket security interest to T2T. Wyndcrest made a similar filing on May 3, 2001. On May 8, 2002, the security interests held by T2T and Wyndcrest were assigned to TW.  John Textor is a principal in both Wyndcrest and T2T, and is also a principal in TW.

Defendant, U.S. Bank, claims a secured interest in Sims' molds through its debtor C-

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 2

Tech. Before filing for Chapter 7 bankruptcy on June 29, 2001, C-Tech was indebted to U.S. Bank in the sum of $1.2 million. As a part of its lending agreement, U.S. Bank had a security interest in, among other things, C-Tech's accounts receivable and equipment. On May 4, 2001, C-Tech sent a letter to Sims requesting immediate payment of $657,821.03, the amount outstanding on Sims' account. In the same letter, C-Tech informed Sims that it was asserting a fabricator's lien against Sims' molds as authorized by RCW 60.84.010. Sims did not pay as directed. Shortly thereafter, C-Tech also failed to meet its loan repayment obligations to U.S. Bank. As a result, on June 25, 2001, U.S. Bank sent a letter to Sims, informing Sims that C-Tech had pledged its accounts receivable to U.S. Bank, and that Sims should pay its outstanding balance directly to U.S. Bank. In addition, U.S. Bank assumed C-Tech's fabricator's lien against Sims' molds.

On June 29, 2001, C-Tech filed for Chapter 7 Bankruptcy. On July 5, 2001, Don Thacker ("Thacker") was appointed the trustee of C-Tech's bankruptcy estate. On July 31, 2001, the U.S. Bankruptcy Court of the Western District of Washington granted Thacker the power to sell and release C-Tech inventory and equipment without obtaining the court's permission for every sale, so long as he first obtained U.S. Bank's advance written consent to the terms of the sale or release. (Dkt. #19, Ex. C). The court's order provided that inventory which was not subject to the terms of a pre-petition invoice "may be sold in whole or in part in one or more sales transactions, at such prices and under such terms as the Trustee and U.S. Bank shall agree in writing." (Dkt. #19, Ex. C at 1).

In the week after the bankruptcy court authorized Mr. Thacker to dispose of C-Tech's assets, Russell Garrett ("Garrett"), an attorney representing T2T and Wyndcrest, and Mr. Thacker discussed the disposition of Sims' snowboard binding molds. Mr. Garrett and Mr. Textor had also apparently been in talks with Mr. Thacker and Casey Mills ("Mills"), an attorney representing U.S. Bank, regarding T2T and Wyndcrest's desire to obtain access to Sims' molds

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 3

1  so that they could fabricate snowboard bindings to fill Sims' outstanding orders.  Plaintiff alleges
2  that after the issuance of the court order, Thacker agreed to release the molds to T2T and
3  Wyndcrest, and sell a quantity of snowboard bindings in C-Tech's inventory for $30,000.
4  Plaintiff also asserts that the primary purpose of the transaction was to obtain possession of the
5  molds.

6  U.S. Bank claims that no such contract or business expectancy existed or could have
7  been relied upon since it had consistently informed T2T and Wyndcrest that it would not consent
8  to the release of the molds.  Mr. Thacker states that he spoke with Casey Mills, was informed
9  that U.S. Bank would not consent to release of the molds, and communicated U.S. Bank's
10 unwillingness to release the molds to Mr. Textor.

11 Despite the apparent lack of consent by U.S. Bank, T2T and Wyndcrest sent a truck to
12 C-Tech's factory to collect the bindings and the molds on August 10, 2001.  Plaintiff claims that
13 on that day, Mr. Garrett and Mr. Thacker surveyed the C-Tech premises and identified which
14 plastic injection molds belonged to Sims, and watched together as they were loaded onto the
15 truck.

16 U.S. Bank claims that Mr. Thacker never authorized the truck driver to load the molds,
17 and that once Thacker was made aware of the molds being loaded onto the truck he ordered
18 them to be off-loaded.  Mr. Thacker then phoned U.S. Bank and Mr. Garrett to determine
19 whether there was an agreement regarding the molds of which he was unaware.  While Mr.
20 Thacker was on the phone, the truck left the premises with the molds.  Upon discovering that
21 the truck had gone, Mr. Thacker demanded to the T2T and Wyndcrest personnel on site that the
22 molds be returned, or they would face serious consequences.  Eventually the truck did return
23 and the molds were unloaded.  Plaintiffs claim that Mr. Thacker only insisted on the return of
24 the molds after being threatened with prosecution by U.S. Bank's representatives.

25 Twenty days later, on August 30, 2001, U.S. Bank and Sims entered into an agreement
26

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 4

to release the molds to Sims for a payment of $20,000 to U.S. Bank, and an agreement by U.S. Bank to take no further action against Sims on its debt to C-Tech. Sims made the $20,000 payment and the molds were released. However, Sims made no further payment on its debt to U.S. Bank. As a result, on November 2, 2001, U.S Bank sued Sims in Clark County Superior Court seeking payment of its outstanding debt to C-Tech. Sims appeared in the case but did not file any pleadings or otherwise defend itself. U.S. Bank then obtained a default judgment for $689,264.56.

On August 4, 2004, TW commenced this action against U.S. Bank, claiming that U.S. Bank's actions amounted to tortious interference in its contract with Mr. Thacker, and conversion of the molds. The case was initially filed in King County Superior Court, and was subsequently removed by U.S. Bank to this Court. U.S. Bank has moved for summary judgment in its favor on both of these claims.

**B. Applicable Law**

Jurisdiction in the instant case is based on diversity of the parties. Accordingly, the issues presented are governed by Washington State law. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Insurance Co. N. Am. v. Federal Express Corp.*, 189 F.3d 914, 919 (9th Cir. 1999) (explaining that in an ordinary diversity case, federal courts apply the substantive law of the forum in which the court is located). The parties present no argument on this issue.

**C. Motion to Withdraw Admission**

As a threshold issue, the Court addresses plaintiff's motion to withdraw an alleged admission. (Dkt. #20).

*1. Background*

On December 23, 2004, defendant served on plaintiff its first set of interrogatories and request for admission. The single request for admission asked plaintiff to admit that none of the

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 5

entities defined therein as "Assignors" held a perfected security interest in Sims' assets prior to August 30, 2001. Plaintiff apparently failed to respond to the admission, although it did respond to the interrogatories.

Because plaintiff failed to respond to the request for admission, it is deemed admitted under Rule 36 of the Federal Rules of Civil Procedure, and defendant has relied on that admission in seeking summary judgment. Plaintiff now seeks to withdraw its admission, or, in the alternative, asks that the response deadline be extended so that it may timely respond to the request for admission.

Defendant argues that a withdrawal of the admission would prejudice its ability to litigate this case since it has already relied upon the admission, and asks this Court to deny plaintiff's motion.

*2. Discussion*

Rule 36(b) of the Federal Rules of Civil Procedure provides that "the court may permit withdrawal or amendment [of an admission] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." Fed. R. Civ. P. 36(b). The Ninth Circuit Court of Appeals has held that "the party who obtained the admission has the burden of proving that allowing withdrawal of the admission would prejudice its case." *Sonoda v. Cabrera*, 255 F.3d 1035, 1039 (9th Cir. 2001) (citing *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995)).

In the instant case, plaintiff's security interest in Sims' assets is central to the consideration of the merits. Although plaintiff's claim are primarily concerned with the alleged contract between Mr. Thacker and Mr. Textor, consideration of the existing security interests will be necessary when considering whether or not defendant interfered with the contract, or if it was justified in its alleged interference. As such, it is clear that "the presentation of the merits of

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 6

the action will be subserved" by allowing Plaintiff to argue that it had a previously perfected security interest in Sims' security assets.

Defendant claims that it would be prejudiced by the withdrawal of the admission because it has relied upon it in its summary judgement motion. Defendant also argues that allowing the admission to be withdrawn would be unjust in light of what it perceives to be incomplete answers to the interrogatories. The Ninth Circuit Court of Appeals has noted that "[t]he prejudice contemplated by 36(b) is not simply that the party who obtained the admission will now have to convince the factfinder of the truth; rather, it relates to the difficulty a party may face in proving its case, for example by the unavailability of key witnesses in light of the delay." *Sonoda*, 255 F.3d at 1039. The Court agrees that withdrawal of the admission would make it more difficult for defendant to prove its case, since it would have to show that its security interest in the molds is superior to plaintiff's security interest. However, this comparison of security interests would not be an untimely burden on defendant as it was previously aware that plaintiff is also asserting a security interest in the molds. Prior to the service of interrogatories and request for admission, plaintiff had already provided defendant with copies of security agreements it had filed in 2002. Additionally, in its response to defendant's interrogatories, plaintiff asserted that it did have a perfected security interest in the molds. Thus, withdrawal of the admission would not force defendant to deal with an issue of fact of which it was previously unaware.

Furthermore, defendant's concern as to the completeness of plaintiff's interrogatory responses appears to be without merit. Plaintiff's response to Interrogatory No. 9, which pertains to the security interest in the molds, clearly states that Sims paid C-Tech to fabricate the molds, and that at all times Sims maintained ownership of the molds. Although the response may not be as detailed as defendant would like, it is certainly detailed enough to have put defendant on notice that plaintiff intended to assert that Sims had a perfected security interest in

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 7

the molds. Accordingly, the Court GRANTS plaintiff's motion to withdraw its admission.

**D. Motion for Summary Judgment**

*1. Summary Judgment Standard*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 257. Mere disagreement, or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment. *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Material facts are those which might affect the outcome of the suit under governing law. *See id.* In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

Interpretation of a statute is a question of law for the Court. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

*2. Tortious Interference*

The Ninth Circuit Court of Appeals has recognized that a claim of tortious interference under Washington state law consists of four elements: "(1) the existence of a valid contractual

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 8

relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage." *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir. 1997) (citing *Pleas v. City of Seattle*, 112 Wash. 2d 794, 774 P.2d 1158, 1161 (Wash. 1989)(en banc)). The Court will examine these elements in turn

<u>a. Existence of a Contract</u>

Defendant first argues that plaintiff has failed to provide sufficient evidence to show that a "valid contractual relationship or business expectancy" existed between plaintiff and Mr. Thacker, especially in light of the fact that Mr. Thacker has declared that he never agreed to release the molds, and that he informed Mr. Garrett that the molds could not be released until U.S. Bank consented. (Dkt. #19 at 6). Plaintiff responds that, based upon its own declarations, it has shown that Mr. Garrett had extensive conversations with Mr. Thacker which resulted in an understanding that Mr. Thacker would allow the molds to be transferred to T2T and Wyndcrest. The Court disagrees with plaintiff.

Washington courts have held that "[t]he burden of proving a contract is on the party asserting it and requires proof of each essential element." *Siekawitch v. Washington Beef Producers, Inc.*, 58 Wn. App. 454, 461 (1990) (citing *Johnson v. Nasi*, 50 Wn.2d 87, 91 (1957)). Washington courts have further held that "[f]or a contract to exist, there must be a mutual intention or 'meeting of the minds' on the essential terms of the agreement." *Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn. App. 846, 851 (2001) (quoting *McEachren v. Sherwood & Roberts, Inc.*, 36 Wn. App. 576, 579 (1984)).

Under the terms of the July 31, 2001 bankruptcy court order, Mr. Thacker could not release C-Tech property without the written consent of U.S. Bank. (Dkt. #19, Ex. C). Thus, an "essential element" of any contract to release the molds at issue would be U.S. Bank's consent to such contract. Plaintiff does not dispute that it was fully aware of the terms of the bankruptcy

1 court order prior to August 10, 2001. Nor does it contest defendant's assertion that plaintiff
2 had been told as early as July of 2001, that defendant would not consent to the release of the
3 molds until Sims' outstanding debt to C-Tech was paid. Furthermore, plaintiff does not contest
4 the fact that, during the negotiations leading up to the attempt to collect the molds on August
5 10, 2001, Mr. Thacker informed Mr. Garrett that defendant would agree to release the bindings
6 for $30,000, but would not release the molds. Accordingly, although plaintiff attempts to create
7 a genuine issue of material fact regarding the existence of a contract, its failure to present any
8 evidence of defendant's consent to the release of the molds leads to the conclusion that no
9 contract existed, and no reasonable jury could find otherwise.

10 Plaintiff next argues that, even if a contract did not exist, defendant interfered with its
11 business expectancy in receiving the molds. Indeed, Washington courts have held that "an
12 existing enforceable contract is not necessary to support an action for interference with business
13 relationships. All that is needed is a relationship between parties contemplating a contract, with
14 at least a reasonable expectancy of fruition." *Broten v. May*, 49 Wn. App. 564, 569 (1987)
15 (citing *Scymanski v. Dufault*, 80 Wn.2d 77, 84-85 (1971)). However, the Court finds that
16 plaintiff's argument fails for the same reasons noted above. Plaintiff could not have had a
17 "reasonable expectancy of fruition" when it knew that U.S. Bank would have to consent to the
18 release of any of the molds. Thus, plaintiff could not have had a reasonable business expectancy
19 in receiving the molds, unless it received U.S. Bank's written consent to the release. Since no
20 evidence of the requisite consent exists in the record, and Mr. Thacker denies making any such
21 promise, plaintiff's claim for interference in a business expectancy must also fail.

22 <center>b. Intentional Interference</center>

23 The Ninth Circuit Court of Appeals has held that when considering a claim of tortious
24 interference "[t]he third element, intent, denotes purposefully improper interference." *Omega*
25 *Envt'l*, 127 F.3d at 1166 (citing *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 10

(1989)). Defendant argues that, even assuming a valid contract or business expectancy existed, its refusal to release the molds on August 10th was not "improper" because it was protecting its security interest in the molds. Plaintiff answers that defendant knew, or should have known, that its security interest was junior to T2T and Wyndcrest's security interest.

In *Omega Envt'l* the Court of Appeals noted that "[a]sserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose." *Omega Envt'l*, 127 F.3d at 1166. Similarly, in *Birkenwald Distrib. Co.*, *supra*, the Washington State Court of Appeals held that a wine distributor did not act improperly when it decided to stop selling to a retailer because it had a contractual right to do so and was only acting to protect its economic interests. In the instant case, defendant, pursuant to Bankruptcy Court's order, had the right to refuse the sale of C-Tech's assets by declining to consent to such sale. Furthermore, plaintiff has presented no evidence to suggest that defendant's refusal was for any purpose other than to protect its own economic interests. Therefore, defendant's refusal to consent to the release of the molds to T2T and Wyndcrest does not qualify as an "improper" action under the Washington courts' definition of tortious interference.

Plaintiff seeks to distinguish *Birkenwald Distrib. Co.* from this case, arguing that in *Birkenwald* the court relied upon the fact the asserted right in question was based on an existing contract between plaintiff and defendant. Thus, plaintiff argues that *Birkenwald* does not apply since the contractual right asserted by defendant derives from a contract to which plaintiff, and its predecessors in interest T2T and Wyndcrest, were not a party. The Court is not persuaded by plaintiff.

The *Birkenwald Distrib. Co.* court was not concerned with where the interest relied upon by the defendant arose from, but rather with whether the defendant relied upon that interest in good faith. The court explained that "[a] defendant 'who in good faith asserts a legally protected interest of his own which he believes may be impaired by the performance of a

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 11

proposed transaction is not guilty of tortious interference.'" *Birkenwald Dist. Co.*, 55 Wn. App. at 10 (citation omitted). Thus, a defendant cannot be guilty of tortious interference as long as the defendant relied upon *any* legally protected interest in good faith.

Accordingly, the Court finds that, even assuming that a valid contract or business expectancy existed, defendant's refusal of consent was not an improper act, and therefore, it can not be liable for tortious interference.

### c. Conversion

Finally, plaintiff argues that its perfected security interest in the molds was converted by defendant when it refused to release the molds on August 10, 2001. Defendant responds that its refusal to release the molds cannot be considered to be conversion since it also had a perfected security interest in the molds. The Court agrees with defendant.

Washington courts have adopted the following definition of conversion: "[c]onversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession." *Meyers Way Dev. Ltd. Pshp. v. University Sav. Bank*, 80 Wn. App. 655, 674 (1996). In order to maintain a conversion claim, a plaintiff only needs to establish that it has "some property interest in the goods allegedly converted." *Meyers Way Dev. Ltd. Pshp.*, 80 Wn. App. at 674. It is undisputed that both plaintiff and defendant have perfected security interest in the molds. Thus, the only remaining question is which party has a superior security interest.

Plaintiff's security interest in the molds was assigned to it by T2T and Wyndcrest. T2T and Wyndcrest perfected their security interests in the molds on March 8, 2001, and May 3, 2001, respectively.[1] Defendant obtained its security interest in the molds from C-Tech. C-

---

[1] U.S. Bank argues that plaintiff has failed to provide sufficient evidence to show that Sims, T2T, or Wyndcrest had a secured interest in the molds. However, the Court notes that plaintiff has provided copies of the UCC filings by T2T and Wyndcrest, and finds that these documents, along with the supporting declarations, provide sufficient evidence that T2T and Wyndcrest had a perfected security interest in the molds.

1  Tech's security interest in the molds derives from RCW 60.84.010, which states that "[a] plastic

2  fabricator . . . has a lien, dependent on possession, on a . . . mold . . . belonging to the customer

3  for the amount owing from the customer for plastic fabrication work and for the value of

4  materials used in the work." RCW 60.84.010(1).

5  Plaintiff argues that C-Tech's fabricator's lien was not perfected until May 4, 2001, the

6  date that C-Tech sent a letter to Sims giving it notice that C-Tech intended to enforce its

7  fabricator's lien. In support of that argument, plaintiff relies on RCW 60.84.010(2), which

8  states that "[b]efore a lien is enforced, the fabricator must cause written notice to be delivered

9  personally or by registered or certified mail to the last known address of the customer." The

10 Court is not persuaded.

11 Section 60.84.010(2) refers to the enforcement of a lien that already exists. Thus, C-

12 Tech's lien must have come into existence prior to its written notice of intent to enforce that

13 lien. Indeed, RCW 60.84.010(1) states that a fabricator "has a lien" as long as they have

14 possession of the molds and an amount is owed by the customer. Plaintiff does not dispute that

15 Sims was past due on its account with C-Tech as far back as October 31, 2000. Thus, under the

16 plain meaning of RCW 60.84.010(1), C-Tech's lien in the molds would have come into

17 existence sometime prior to the 2001 dates on which T2T and Wyndcrest perfected their

18 security interests.

19 Accordingly, it appears that plaintiff's security interest in the molds is junior to the

20 security interest held by U.S. Bank. Thus, U.S. Bank's refusal to release the molds on August

21 10, 2001, does not constitute conversion.

### III. CONCLUSION

23 The Court GRANTS plaintiff's motion to withdraw its admission. (Dkt. #20).

24 Having reviewed defendant's motion for summary judgment, plaintiff's opposition,

25 defendant's reply, the declarations in support of those briefs, and the remainder of the record,

26

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 13

1  the Court hereby GRANTS defendant's motion for summary judgment (Dkt. #15) and

2  DISMISSES plaintiff's tortious interference and conversion claims against it.  This case is now

3  CLOSED.

4      The Clerk shall forward a copy of this Memorandum Order to all counsel of record.

5      DATED this 27th day of May, 2005.

                                              /s/ Ricardo S. Martinez

                                            RICARDO S. MARTINEZ
                                            UNITED STATES DISTRICT JUDGE